UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GIOTTO GERMANY,

       Plaintiff,                 Case No. 21-10879

v.                                 HON. MARK A. GOLDSMITH

DEREK WATKINS,

       Defendant.
_____/

**OPINION & ORDER**
**(1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO THE FEDERAL CLAIMS (Dkt. 53), (2) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. 56), AND (3) DISMISSING WITHOUT PREJUDICE PLAINTIFF'S STATE-LAW CLAIMS**

This matter is before the Court on Defendant Derek Watkins's motion for summary judgment (Dkt. 53) and Plaintiff Giotto Germany's motion for partial summary judgment (Dkt. 56). For the reasons that follow, the Court grants Watkins's motion as to the federal claims against him, denies Germany's motion, and dismisses without prejudice Germany's state-law claims pursuant to 28 U.S.C. § 1367(c)(3).[1]

**I. BACKGROUND**

Plaintiff Giotto Germany brings this action against Defendant Derek Watkins, a police officer employed by the City of Warren. Compl. (Dkt. 1). The action arises from events that occurred on

---

[1] Because oral argument will not aid the Court's decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to Watkins's motion for summary judgment, the briefing for the motion includes Germany's response (Dkt. 65) and Watkins's reply (Dkt. 69). In addition to Germany's motion for partial summary judgment, the briefing for the motion includes Watkins's response (Dkt. 63) and Germany's reply (Dkt. 71).

January 20, 2020, when Watkins responded to a 911 call that was placed at Germany's home. Id. ¶ 15.

The parties offer different versions of the events, but they agree that on January 20, Watkins responded to a 911 call that Renee Valenti made from Germany's home. Def. Mot. for Summ. J. at 15; Pl. Resp. to Def. Mot. for Summ. J. at 1. According to Watkins, Germany rented a room in his home to Valenti. Def. Mot. for Summ. J. at 13. In contrast, Germany maintains that he never agreed to rent a room to Valenti and that Valenti broke into his home. Pl. Resp. to Def. Mot. for Summ. J. at 4. When Valenti called 911, she stated that German was threatening to throw her belongings out of the home. Audio 911 call by Valenti at 0:45–0:52 (Dkt. 56-2)[2]; 1/20/20 City of Warren CAD Report (Dkt. 53-14).

In response to this call, Watkins and a detective arrived at the home. 1/20/20 City of Warren Case Report (Dkt. 53-6); Video of Watkins Microphone and Squad Car (Dkt. 56-3).[3] Before Watkins's arrival, Warren Police Department dispatch informed him that officers had responded to the address multiple times the previous night following calls from Valenti and Germany. 1/20/20 City of Warren Case Report; 1/20/20 City of Warren CAD Report; Def. Mot. for Summ. J. at 27; Pl. Resp. to Def. Mot. for Summ. J. at 1, 5. When Watkins arrived, Valenti told Watkins that she had moved into the home in January, that she was paying to rent a room, and that Germany was threatening to kick her out of the home. Video of Watkins Microphone and Squad Car at 2:35–4:11.

---

[2] Valenti's 911 call was filed using the Court's media file upload system, so it is not available on the docket.

[3] The video of Watkins's squad car and the audio of Watkins's microphone were filed using the Court's media file upload system, so it is not available on the docket.

2

Watkins told Germany that Valenti had established residency in the home. Id. at 6:49–6:51. He also told Germany to "evict her, if you don't want her here." Id. at 8:30–8:32. Germany agreed that he needed to evict Valenti. Id. at 8:32–8:54; Germany Dep. at 123–124 (Dkt. 65-2). He informed Watkins that he had tried to do so on Saturday, but that the court was closed, and he stated that he had already planned to go to court the following day to evict Valenti. Video of Watkins Microphone and Squad Car at 8:32–8:54; Germany Dep. at 123–124.

Watkins told Germany, "While you're waiting to do that tomorrow, don't go in her [Valenti's] bedroom." Watkins Microphone and Squad Car at 8:54–8:56. Germany insisted that the room was his bedroom and that he was going to enter his bedroom. Id. at 8:56–9:00. Watkins later told Germany that Valenti had established residency to the bedroom and that, as a landlord, Germany could not simply enter the room. Id. at 15:00–15:05; 15:11–15:21; 15:41–15:48. Germany responded, "but I have a right to my stuff." Id. at 16:27–16:29. Watkins then told Germany, "You don't have a right to go in and out of that room . . . You have to provide 24 hours' notice . . . to go in . . . if . . . you violate that, you can go to jail for that." Id. at 16:29–16:32; 16:47–16:58.

During the interaction between Watkins and Germany, Watkins indicated that other officers had been previously called to Germany's home many times. Id. at 4:26–4:30; 11:18–11:33. The parties dispute the nature of these prior matters—including whether they involved non-emergencies and landlord-tenant disputes similar to the one on January 20. See Def. Mot. for Summ. J. at 2, 4; Pl. Resp. to Def. Mot. for Summ. J. at 5–6. They agree, however, that officers arrived at Germany's home in response to 911 calls twice on January 17 and that, on January 19, Germany called 911 twice, and Valenti called multiple times. Def. Mot. for Summ. J. at 3; Pl. Resp. to Def. Mot. for Summ. J. at 5.

3

While Watkins was still in the home, Germany called 911. Audio 911 Call by Germany (Dkt. 56-5).[4] Germany told the operator, "One officer is telling me I can't come in my own room." Id. at 0:03–0:06. The operator directed Germany to talk to the officers there with him. Id. at 0:43–0:47. Germany stated, "yeah, one officer is telling me different and he said I'm breaking the law if I go in my room, with my stuff, touching my property . . . ." Id. at 0:43–0:52. The operator asked Germany what he would like her to do given that officers were already there. Id. at 0:55–0:58. Germany told the operator to hang on. Id. at 1:02–1:04. The operator stated, "You're not going to tell me to hang on," and the call ended. Id. at 1:04–1:08.

Watkins then confirmed with the Warren Police Department dispatch that Germany had just called 911. 1/20/20 City of Warren Case Report. Watkins then arrested Germany and transported him to the Warren police station. Id. Watkins prepared a police report that documented "misuse of 911" and that stated the following:

> Giotto was advised multiple times on the proper eviction process but continued to advis[e] me that I was wrong. While I was speaking to Giotto, he called 911 and advised WPD Dispatch that I was giving him incorrect information about the eviction process.

Police Report (Dkt. 56-7). Watkins also completed a warrant request. In the section titled "summary of offense," the report states that Germany "called 911 in the presence of an officer while there was no emergency situation to call for." Warrant Request (Dkt. 56-8).

Germany was charged with "unlawfully summon[ing], as a joke, prank, or otherwise without good reason, by phone the Warren Police on 1-20-2020 to [his home] where such service was not required," in violation of a City of Warren ordinance titled "False alarms." Criminal Compl. (Dkt. 65-38); see also City of Warren Code of Ordinances § 22-24(b) (Dkt. 53-20).

---

[4] Germany's 911 call was filed using the Court's media file upload system, so it is not available on the docket.

4

On January 21, 2020, Germany was arraigned in the 37th District Court. Arraignment Tr. (Dkt. 65-27). He was unable to post bond and was detained pending trial. Proof of Incarceration (Dkt. 65-33). On February 6, 2020, Germany appeared for a pretrial hearing, and his attorney informed the court that Germany wanted to go to trial. Pretrial Tr. at 3 (Dkt. 65-11). At the final pretrial hearing, Germany's attorney told the court that Germany was requesting a bench trial. Final Pretrial Tr. at 4 (Dkt. 56-12). The court scheduled a bench trial for March 5, 2020. Id.

On the date of what was supposed to be his bench trial, Germany was asked on the record if he could go three months without improperly calling 911, and he stated that he could. 3/5/20 Tr. at 3 (Dkt. 65-31). Germany also signed a form, dated March 5, 2020, titled "Motion to Amend and/or Dismiss." 3/5/20 Mot. to Amend and/or Dismiss (Dkt. 56-14). Germany's attorney and a City attorney also signed the form. Id. The form contained a provision stating that "[a]s a condition of this plea agreement (whether this case is dismissed or not), Defendant agrees to release the City, its officers, employees and agents from any and all claims . . . that arise from the incident which gave rise to the prosecution in this case." Id. Germany placed his initials below the release provision. Id. The court gave Germany a personal bond and scheduled a review hearing to take place in 90 days. 3/5/20 Tr. at 3–4. Germany was released from custody on March 12, 2020. Proof of Incarceration.

According to Germany, on April 2, 2020, he spoke with 911 twice—after Valenti and the significant other of Germany's former girlfriend appeared at his home. Germany Aff. ¶¶ 63–67 (Dkt. 56-6).

On July 23, 2020, Germany returned to 37th District Court. Review Hr'g Tr. (Dkt. 65-34). His attorney moved to dismiss the case, and the court granted the motion and dismissed the case against Germany. Id. Germany signed another Motion to Amend and/or Dismiss dated July 23,

5

2020. 7/23/20 Mot. to Amend and/or Dismiss (Dkt. 53-31). The motion states that the government moves for the dismissal of count one because Germany had not made any 911 calls in 3 months and references the first motion. Id. It contains the same release provision as the first motion. Id. Germany placed his initials below the release provision. Id.

Germany later filed this action. He brings three claims under 42 U.S.C. § 1983: (i) First Amendment retaliation, (ii) false arrest, and (iii) malicious prosecution. Compl. ¶¶ 143–159. He also brings state-law claims of false imprisonment, malicious prosecution, and intentional infliction of emotional distress. Id. ¶¶ 160–178.

## II. ANALYSIS[5]

Both parties have filed motions for summary judgment. Watkins seeks summary judgment on all of Germany's claims. Germany seeks summary judgment on the § 1983 false arrest and malicious prosecution claims. The Court begins by considering Watkins's qualified immunity defense as to the federal claims. The Court finds that Watkins is entitled to qualified immunity. The Court then explains that because it grants summary judgment to Watkins on the federal claims, it dismisses the state-law claims.

### A. Qualified Immunity

To establish a § 1983 claim, a plaintiff must prove "that (1) a person, (2) acting under color of [S]tate law, (3) deprived [the plaintiff] of a federal right." Berger v. City of Mayfield Heights, 265

---

[5] In assessing whether either party is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

F.3d 399, 405 (6th Cir. 2001). "Qualified immunity is an affirmative defense" to a § 1983 claim. English v. Dyke, 23 F.3d 1086, 1089 (6th Cir. 1994). Qualified immunity "shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Barker v. Goodrich, 649 F.3d 428, 433 (6th Cir. 2011).

To determine whether a law enforcement officer is entitled to qualified immunity, a court considers "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." Est. of Carter v. City of Detroit, 408 F.3d 305, 310–311 (6th Cir. 2005). A right is clearly established when "existing precedent place[s] the conclusion" that the defendant violated the constitution under the circumstances "beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). "Qualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact." Johnson v. Mosley, 790 F.3 649, 653 (6th Cir. 2015). Once a government official raises qualified immunity as a defense, the plaintiff has the burden to demonstrate that the government official is not entitled to qualified immunity. Silberstein v. City of Dayton, 440 F.3d 306, 311 (6th Cir. 2006).

"When evaluating the defense of qualified immunity on a motion for summary judgment, the court must adopt the plaintiff's version of the facts." Campbell v. City of Springboro, Ohio, 700 F.3d 779, 786 (6th Cir. 2012). "If, based upon these facts, no constitutional right was violated, there is no need for further inquiry." Id. But if the court determines that the plaintiff can make out a violation of a constitutional right, the court must then examine whether the right was clearly established at the time of the alleged violation. Id.

This Court discusses each alleged constitutional violation in turn.

7

1. **First Amendment Retaliation Claim**

Germany alleges that, "in retaliation for [Germany] disagreeing with [Watkins's] order and Germany's call to 911 to report what was happening," Watkins arrested Germany without probable cause and subjected him to prosecution. Pl. Resp. to Def. Mot. for Summ. J. at 23–24; Compl. ¶¶ 143–146.

To establish retaliation for engaging in constitutionally protected activity, a plaintiff must prove the following elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." Thaddeus–X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999).

The existence of probable cause to arrest generally defeats a claim that an arrest was in retaliation for speech protected by the First Amendment. Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019). "A police officer has probable cause only when [he or she] discovers reasonably reliable information that the suspect has committed a crime." Gardenhire v. Schubert, 205 F.3d 303, 318 (6th Cir. 2000). Probable cause is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." United States v. McClain, 444 F.3d 556, 562 (6th Cir.2005) (punctuation modified). To determine whether an officer had probable cause to arrest an individual, a court must examine "all facts and circumstances within [the] officer's knowledge at the time of [the] arrest." Dietrich v. Burrows, 167 F.3d 1007, 1012 (6th Cir. 1999). "A finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that is required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime."

Harris v. Bornhorst, 513 F.3d 503, 511 (6th Cir.2008). Under § 1983, an arresting officer is entitled to qualified immunity if he or she "could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." Harris, 513 F.3d at 511. "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." Fridley v. Horrighs, 291 F.3d 867, 872 (6th Cir. 2002).

A City of Warren ordinance provides that "No person shall summon, as a joke or prank, or otherwise without good reason therefor, in any manner whatsoever, the police . . . or any public service, to go to any address where such service is not required." City of Warren Code of Ordinances § 22-24(b); see also Def. Mot. for Summ. J. at 15. Watkins contends that, due to both his "knowledge of [Germany's] recent history of repeated non-emergency calls to 911" and the observations he made in responding to Germany's home on January 20, 2020, he had probable cause to believe that Germany had committed a violation of the ordinance.

The parties dispute the nature of the other calls that Germany made to 911 and whether those matters constituted emergencies. However, under Germany's version of the facts, the totality of the circumstances as they existed at the time that Watkins observed Germany call 911 on January 20, 2020 were sufficient as a matter of law for a reasonable officer to conclude that Germany had violated the ordinance. Before Watkins responded to Valenti's call on January 20, 2020, Warren Police Department dispatch informed him that officers had responded to the address multiple times the previous night due to calls from Valenti and/or Germany. 1/20/20 City of Warren Case Report; 1/20/20 City of Warren CAD Report; Def. Mot. for Summ. J. at 27; Pl. Resp. to Def. Mot. for Summ. J. at 1, 5. When Watkins arrived at the home, Valenti told him that she had been living at the home since the beginning of January and that Germany was threatening to move her belongings

9

out of the home. Video of Watkins Microphone and Squad Car at 2:35–4:11. She also told him that she was paying Germany $250 per month to rent a room in the home. Id. Watkins told Germany that Valenti had established residency and that Germany could evict Valenti if he did not want her there. Id. at 6:49–6:51, 8:30–8:32. Germany agreed that he needed to evict Valenti. Id. at 8:32–8:54; Germany Dep. at 123–124. He told Watkins that he planned to go to court the following day to do so. Video of Watkins Microphone and Squad Car at 8:32–8:54; Germany Dep. at 123–124. Watkins told Germany that, while Germany was waiting until the next day to begin the eviction process, he should not enter Valenti's bedroom. Germany insisted that the room was his bedroom and that was going to enter it. Watkins told Germany that Valenti had established residency to the bedroom and that, as a landlord, Germany could not simply enter the room. Germany responded, "but I have a right to my stuff." Id. at 16:27–16:29. Watkins told him that he had to provide 24 hours' notice before entering the bedroom, and if he did not, he could go to jail. Watkins Microphone and Squad Car at 8:54–8:56, 16:29–16:32; 16:47–16:58. Germany objected, stating, "but I have a right to my stuff." Id. at 16:27–16:29. During the call, Watkins informed Germany that he had previously been to the home and that, in the past few days, other officers had been to the home several times for the same issue. Id. at 4:26–4:30; 11:18–11:33.

    This entire interaction lasted about 20 minutes. Id. Following it—and while Watkins was standing about six feet away from Germany in the home and talking with Germany and Valenti—Germany called 911. Audio 911 Call by Germany. Germany told the operator, "One officer is telling me I can't come in my own room." Id. at 0:03–0:06. The operator directed Germany to speak to the police officers that were already there. Id. at 0:43–0:47. Germany stated, "yeah, one officer is telling me different and he said I'm breaking the law if I go in my room, with my stuff, touching my property . . . ." Id. at 0:43–0:52. The operator again referred to the fact that police

10

were already present. Id. at 0:55–0:58. The call ended after Germany told the operator to hang on. Id. at 1:02–1:08. Watkins then confirmed with dispatch that Germany called 911, and he arrested Germany. 1/20/20 City of Warren Case Report.

Based on these observations, Watkins had probable cause to believe that, by calling 911 about the same landlord-tenant dispute that Watkins had been discussing with Valenti and Germany when he and another officer were already present, Germany violated the city ordinance that prohibits, "without good reason," summoning the police or any public service to go to an address where they are not required. Thus, "based on the facts and circumstances within [Watkins's] knowledge at the moment," there was sufficient "reasonably trustworthy information" "to warrant a prudent [person] in believing" that sufficient probable cause existed to arrest Germany for violating the City ordinance. Peet v. City of Detroit, 502 F.3d 557, 563–564 (6th Cir. 2007). Watkins was, therefore, justified in arresting Germany and in initiating prosecution by submitting a police report that noted a "misuse of 911" and a warrant request that stated that Germany "called 911 in the presence of an officer while there was no emergency situation to call for." See Police Report; Warrant Request.

Germany alleges that Watkins did not have probable cause to arrest him because he did not summon the police to go to his address during the call, but rather called 911 to seek clarification about Watkins's order given that it conflicted with information from officers who had previously visited his home. Pl. Resp. to Def. Mot. for Summ. J. at 18. He also states that no evidence suggests that his call was made as a joke or prank and that he had good reason to call when Watkins "told [him] that he would be arrested if he entered his own bedroom to retrieve his medications and his property." Id. at 25.

11

Neither of these assertions undermine the existence of probable cause. As Watkins notes, it is objectively reasonable to believe that an explicit summons is not required for violation of the ordinance and that a caller may be deemed to be summoning emergency assistance even if he or she does not specifically direct 911 to go to an address but rather reports to a 911 operator an event he or she is witnessing. And, given that, as Watkins noted during the interaction, 911 operators dispatched police officers to Germany's home in response to the many calls by him or Valenti before January 20, it was not unreasonable for Watkins to believe that Germany's call was another summons for assistance. Even if Watkins's interpretation of the city ordinance was incorrect—and Germany points to no authority suggesting that it was—an officer is entitled to qualified immunity if the officer "could reasonably (even if erroneously) have believed that the arrest was lawful" given the clearly established law and the information the officer possessed at the time of the arrest. Harris, 513 F.3d at 511.

Further, to satisfy probable cause in this instance, a reasonable officer need not have a fair probability that Germany summoned the police to go to an address where such service is not required as a joke or prank—only that he did so "without good reason." See City of Warren Code of Ordinances § 22-24(b). And the probable-cause showing is not defeated by the fact that, before Germany called 911, Watkins directed Germany that he needed to provide notice before entering the bedroom and knew that Germany had belongings in the bedroom. To the extent Germany argues that good reason supported the call because he had medication in the bedroom, there is no evidence that, at the time of the arrest, Watkins knew of any health conditions Germany may have, knew that Germany had medications in the bedroom, or knew that Germany needed access to these medications.

Because Watkins had probable cause to arrest Germany and initiate the prosecution by submitting a police report and warrant request, he is entitled to qualified immunity on the First Amendment claim.

The Court also notes there are two actions that Germany alleges prompted the retaliation: (i) his disagreement with Watkins's order to stay out of the bedroom and (ii) his call to 911 to report Watkins's order. Pl. Resp. to Def. Mot. for Summ. J. at 23–24; Compl. ¶¶ 143–146. To the extent his First Amendment claim is based on his call to 911, Watkins is entitled to qualified immunity for another reason: Germany has not met his burden in showing that Watkins violated a clearly established constitutional right of which a reasonable person would have known. Germany does not cite any cases that support his contention that calling 911 is protected speech. Instead, he states that his right "to question and disagree with 'public officials is well-established and supported by ample case law.'" Pl. Resp. to Def. Mot. for Summ. J. at 23 (quoting McCurdy v. Montgomery Cnty., Ohio, 240 F.3d 512, 520 (6th Cir. 2001)). In addition, he cites the right to petition. Id. (citing Borough of Duryea v. Guarnieri, 564 U.S. 379, 388–389 (2011)).

But by appealing to the right to criticize public officials, Germany defines the constitutional right at issue too broadly. To avoid the qualified immunity defense, he must present evidence that makes out a violation of a constitutional right clearly established in a "particularized sense." Brosseau v. Haugen, 543 U.S. 194, 198–199 (2004). "The right said to have been violated must be defined 'in light of the specific context of the case, not as a broad general proposition.'" Johnson v. Mosely, 790 F.3d 649, 654 (6th Cir. 2015) (quoting Brosseau, 543 U.S. at 198–199). Further, the United States Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." District

13

of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018). Therefore, the Court must examine "the particular situation that [Watkins] confronted and ask whether the law clearly established that [his] conduct was unlawful." Howse v. Hodous, 953 F.3d 402, 407 (6th Cir. 2020).

Germany does not point to any cases relevant to the situation that Watkins confronted, i.e. cases that teach that, when police officers are already present for an eviction-related dispute and an individual calls 911 related to that situation to discuss an officer's instructions, they may not arrest an individual for violating a city ordinance that prohibits summoning the police for non-emergencies. Because Germany has not identified any cases that address the conduct at issue here, he has not presented sufficient facts to show that Watkins violated a clearly established constitutional right to the extent his First Amendment claim is based on alleged retaliation in response to calling 911. See Howse, 953 F.3d at 407.

### 2. Fourth Amendment False Arrest Claim

In addition to a First Amendment claim, Germany brings a Fourth Amendment false arrest claim under § 1983. Compl. ¶¶ 147–149. To succeed on a false arrest claim under § 1983, a plaintiff must prove that the police officer lacked probable cause for the arrest. Fridley v. Horrighs, 291 F.3d 867, 872 (6th Cir. 2002). Because Watkins had probable cause for the arrest, his conduct did not violate a clearly established constitutional right, and he is entitled to qualified immunity. See Chiaverini v. City of Napoleon, Ohio, No. 21-3996, 2023 WL 152477, at *6 (6th Cir. Jan. 11, 2023); Harvey v. Carr, 616 F. App'x 826, 828 (6th Cir. 2015).

### 3. Fourth Amendment Malicious Prosecution Claim

Germany also brings a Fourth Amendment malicious prosecution claim.[6] The United States Court of Appeals for the Sixth Circuit "recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment," which "encompasses wrongful investigation, prosecution, conviction, and incarceration." Barnes v. Wright, 449 F.3d 709, 715–716 (6th Cir. 2006) (punctuation modified). The tort of malicious prosecution "remedies detention accompanied not by absence of legal process, but by wrongful institution of legal process." Sykes v. Anderson, 625 F.3d 294, 308 (6th Cir. 2010) (emphasis in original, punctuation modified).

To succeed on a Fourth Amendment malicious-prosecution claim under § 1983, a plaintiff must demonstrate that: (i) a criminal prosecution was initiated against the plaintiff, and the defendant "made, influenced, or participated in the decision to prosecute"; (ii) there was no probable cause for the prosecution; (iii) the plaintiff suffered a deprivation of liberty, beyond the initial seizure, as a result of the criminal proceeding; and (iv) the criminal proceeding was resolved in the plaintiff's favor. Id.

Watkins contends that Germany cannot establish the first, second, or fourth elements, while Germany asserts that the undisputed facts satisfy each of those elements. The Court, however, "need not proceed any further than the probable cause analysis to decide [Germany's] malicious prosecution claim." Darrah v. City of Oak Park, 255 F.3d 301, 311–312 (6th Cir. 2001).

---

[6] In his complaint, Germany asserted his malicious prosecution claim under the Fourth and Fourteenth Amendments. Compl. ¶¶ 150–159. In his motion for partial summary judgment, however, he argues only that Watkins violated his Fourth Amendment right to be free from malicious prosecution. Pl. Mot. for Partial Summ. J. at 21–23. "According to [the Sixth] [C]ircuit, malicious-prosecution claims are based on the Fourth Amendment." Howse v. Hodous, 953 F.3d 402, 408 (6th Cir. 2020). Therefore, the Court analyzes Germany's claim under the Fourth Amendment.

Germany contends that Watkins "initiated criminal prosecution against [Germany] when he wrote a police report containing false statements and material omissions." Compl. ¶¶ 150–159; Pl. Resp. to Def. Mot. for Summ. J. at 26. In his police report, Watkins documented "misuse of 911" and stated that "[Germany] was advised multiple times on the proper eviction process but continued to advis[e] me that I was wrong. While I was speaking to Giotto, he called 911 and advised WPD Dispatch that I was giving him incorrect information about the eviction process." Police Report. Germany maintains that Watkins "completely misrepresented the content of [Germany's 911] call and the circumstances leading up to it." Pl. Resp. to Def. Mot. for Summ. J. at 20. In particular, he states that Watkins omitted that he "ordered [Germany] not to enter his bedroom under threat of arrest." Id. He also states that Watkins falsely asserted in the police report that Germany disagreed with him about the eviction process when Germany agreed that he needed to seek an eviction. Id. And he contends that Watkins falsely asserted that Germany informed 911 that Watkins was giving incorrect information about the eviction process when Germany did not mention the eviction process in the call. Id. According to Germany, Watkins "intentionally sought to create[e] a false impression that [Germany's] phone call was a frivolous attempt to summon additional officers because the Plaintiff had some disagreement with the Defendant's instructions to seek an eviction in court." Id. at 27. In addition to challenging those statements and omissions in the police report, Germany takes issue with the statement in the warrant request that he "called 911 in the presence of an officer while there was no emergency situation to call for," which he states caused him to be criminally charged. Pl. Mot. for Partial Summ. J. at 22 (quoting Warrant Request).

Like a false arrest claim, a malicious prosecution claim arises under the Fourth Amendment and, therefore, its "success depends on whether probable cause supported [the plaintiff's] detention

16

and prosecution." Chiaverini, 2023 WL 152477, at *6; see also Howse, 953 F.3d at 409. And under clearly established law, an officer violates the Fourth Amendment's prohibition of unreasonable seizures "only when [his or her] deliberate or reckless falsehoods result in arrest and prosecution without probable cause." Longuski v. Akers, Nos. 21-2688/2711, 2022 WL 4129403, at *2 (6th Cir. Sept. 12, 2022). Therefore, "if this [C]ourt finds that there was probable cause to prosecute [Germany], regardless of any alleged false statements made by [Watkins], then [Germany] cannot make out a malicious prosecution claim under the Fourth Amendment." Darrah, 255 F.3d at 312.

As discussed, probable cause exists when there are enough "facts and circumstances" to make a reasonable officer believe that the "accused was guilty of the crime charged." Webb v. United States, 789 F.3d 647, 660 (6th Cir. 2015) (internal quotation omitted). The question is whether the evidence—including the known exculpatory evidence—adds up to probable cause at the time of arrest. See Klein v. Long, 275 F.3d 544, 551–552 (6th Cir. 2001). Germany was charged with "unlawfully summon[ing], as a joke, prank, or otherwise without good reason, by phone the Warren Police on 1-20-2020 to [his home] where such service was not required," in violation of the City of Warren ordinance titled "False alarms." Criminal Compl.; see also City of Warren Code of Ordinances § 22-24(b). For the reasons set forth above, the facts and circumstances within Watkins's knowledge at the time of the arrest "were sufficient to warrant a prudent [person] in believing that" Germany had committed an offense by, without good reason, summoning police to his home when they were not required. Arnold v. Wilder, 657 F.3d 353, 363 (6th Cir. 2011). Because the facts and circumstances gave Watkins probable cause to believe that Germany had violated the ordinance, they also support Watkins's documentation of "misuse of 911" in the police

17

report, in addition to the statement in the warrant request that Germany "called 911 in the presence of an officer while there was no emergency situation to call for." Police Report; Warrant Request.

The other allegedly false statements and omissions that Germany raises—that Watkins did not mention that Germany could be arrested if he entered what he considered to be his bedroom or that he did not mention the "eviction process" when he called 911 to contest Watkins's direction not to enter the bedroom—do not undermine the probable-cause showing. The police report and warrant request were not meaningfully "off the mark" from the audio footage of Watkins's interaction with Valenti and Germany and the 911 call. See Newman, 773 F.3d at 772 (explaining that an inference of deliberate or reckless disregard for the truth is permissible when a statement is meaningfully "off the mark" from the truth and that a minor "discrepancy" is not enough). While Germany did not use the phrase "eviction process" during the 911 call, he did in fact disagree with Watkins's instruction not to enter the bedroom while he was waiting to go to court the next day to start the eviction process and reported this instruction to 911.

Germany has not presented sufficient evidence that would permit a jury to find that Watkins violated a clearly established constitutional right to freedom from malicious prosecution, so Watkins is entitled to qualified immunity on the malicious prosecution claim.

Qualified immunity applies to each of Germany's federal claims, and Watkins is entitled to summary judgment on these claims.[7]

### B. State-Law Claims

Because the Court grants summary judgment to Watkins on the federal claims, the Court exercises its discretion to decline to exercise supplemental jurisdiction over the remaining state-

---

[7] Because the Court finds that qualified immunity applies, it need not address Watkins's argument that the release agreements bar Germany's claims.

law claims by dismissing these claims without prejudice. 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726–727 (1966) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

### III. CONCLUSION

For the reasons set forth above, the Court grants Watkins's motion for summary judgment as to the federal claims against him (Dkt. 53), denies Germany's motion (Dkt. 56), and dismisses without prejudice Germany's state-law claims pursuant to 28 U.S.C. § 1367(c)(3).

SO ORDERED.

Dated: August 4, 2023  s/Mark A. Goldsmith
Detroit, Michigan  MARK A. GOLDSMITH
United States District Judge